**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HENSEL PHELPS CONSTRUCTION CO., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Case No. 15-1961 (RJL) |
| | ) |
| COOPER CARRY, INC., | ) |
| | ) **FILED** |
| Defendant. | ) |

**SEP 2 8 2016**

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

**MEMORANDUM OPINION**
(September **27**, 2016) [Dkt. #10]

Defendant Cooper Carry, Inc. ("defendant" or "Cooper Carry") helped design the Marriott Marquis Hotel, near the Washington Convention Center, pursuant to a design services contract with Marriott International, Inc. Compl. ¶ 6. Marriott eventually assigned that design services contract to plaintiff Hensel Phelps Construction Co. ("plaintiff" or "Hensel Phelps") pursuant to an agreement with Hensel Phelps that it would build the hotel for a guaranteed maximum price. Compl. Exh. 2, Art. 12.1. In budgeting for this guaranteed maximum price, Hensel Phelps relied on Cooper Carry's preliminary designs. *See* Hensel Phelps's Claim Against Cooper Carry 4, 7 [hereinafter "Claim Narrative"] [Dkt. #10-2]. Once Hensel Phelps took over management of the project, it relied on Cooper Carry to prepare construction documents that it used to begin the building phase of the project. Claim Narrative 5. Unfortunately, problems with Cooper Carry's design documents came to light after Hensel Phelps had already relied on them in pricing the project and in breaking ground on construction. *Id.* After the hotel

project was substantially complete, Hensel Phelps initiated this lawsuit against Cooper Carry to recover its costs from the modifications it was required to make in order to rectify those problems. Compl. ¶¶ 15-16. Hensel Phelps first claims that Cooper Carry breached its design services contract by failing to design the hotel to the proper standards. Compl. ¶¶ 20-25. Its second claim is that Cooper Carry breached the indemnification provision of the contract by failing to indemnify Hensel Phelps for its increased expenses attributable to fixing the design mistakes. Compl. ¶¶ 26-29.

The case is now before the Court on Cooper Carry's Motion to Dismiss Or, Alternatively, Motion For Summary Judgment [hereinafter "Def.'s Mot."] [Dkt. # 10]. In support of its motion, Cooper Carry argues, *inter alia*, that Hensel Phelps's claims are time-barred by the three-year statute of limitations that applies to breach of contract claims. Mem. ISO Def.'s Mot. 8-14 [hereinafter "Def.'s Mem."] [Dkt. #10-1]. Hensel Phelps concedes that a three-year statute of limitations applies, but disputes that the time has run, arguing instead that its claims did not accrue until Cooper Carry's role in the design of the hotel was substantially complete. Pl.'s Opp'n 4 [Dkt. #13]. As to the claim based on the indemnification clause, Cooper Carry moves to dismiss for the additional reason that the agreement plainly does *not* apply to this factual situation. Def.'s Mem. 18-22. Upon consideration of the undisputed chronology of events outlined in the Claim Narrative prepared by Hensel Phelps, as well as the plain text of the relevant contracts, I have concluded that Hensel Phelps's claims based on design errors are time-barred and the indemnification clause refers only to Hensel Phelps's prospective liabilities in third-

2

party litigation.  As such, Cooper Carry's Motion for Summary Judgment must be, and is,

GRANTED.[1]

## FACTUAL BACKGROUND

In October 2010, Hensel Phelps entered into a contract to build the Marriott

Marquis Hotel in Washington, DC for a guaranteed maximum price of approximately

$350 million.  Compl. ¶ 7.  Included in the contract is a listing of the "Preliminary Design

Documents" on which Hensel Phelps relied to calculate that price.  Compl., Ex. 2, Art.

5.6(e).  The parties referred to these as the GMP (guaranteed maximum price) documents.

Claim Narrative 4.  Cooper Carry had created the GMP documents pursuant to a design

services contract with Marriott, which contract Marriott assigned to Hensel Phelps as part

of the contract to build the hotel.  Compl. ¶ 9.

Cooper Carry entered into the design services contract in March 2008.

Compl. ¶ 6.  The contract calls for five phases of design services: (1) the Conceptual

Design Phase, (2) the Schematic Design Phase, (3) the Design Development Phase, (4)

the Construction Document Phase, and (5) the Construction Contract Administration

Phase.  Claim Narrative 3.  Cooper Carry completed the Design Development Phase

(Phase 3) in 2008.  *Id.* at 4.  According to Hensel Phelps, it was entitled under Cooper

Carry's design services contract to rely on those documents created in the first three

phases to calculate its guaranteed maximum price.  *Id.*  When Hensel Phelps assumed

---

[1] The Court need not reach the defendant's argument that these claims cannot lie because Hensel Phelps has already been compensated for its losses either through the contingency budget or the change order process.  *See* Def.'s Mem. 14-18.

responsibility for building the hotel, Cooper Carry was in the midst of the Construction

Document Phase (Phase 4). *Id.* The construction documents were due August 1, 2011,

with due dates along the way for partially complete drafts (e.g., the "60% construction

documents" were due January 15, 2011). *Id.* at 4-5. Hensel Phelps relied on the design

documents and the partially complete construction documents to break ground on

construction of the hotel. *Id.* at 11. Only after completing certain construction phases did

Hensel Phelps discover that the corresponding designs it was using were flawed. *Id.* For

instance, in May 2011, the D.C. Department of Consumer and Regulatory Affairs made a

final determination that the designs did not comply with the local building code's fire

containment requirements. Compl. ¶ 24(b); Claim Narrative 8-13. But Hensel Phelps

had already directed the excavation of the site in conformity with the flawed designs.

Therefore, in modifying its designs to comply with the code, Cooper Carry had to use

less-than-ideal workarounds to accommodate the already completed excavation work.

Claim Narrative 8-13. In total, Hensel Phelps alleges 18 problems with the Cooper Carry

designs that it was required to fix midstream in order to comply with either local code or

its obligations to Marriott. Compl. ¶ 24. Because these problems were only discovered

after the execution of the design plans was already underway, the result was a series of

after-the-fact changes to work already done, which created unexpected costs for Hensel

Phelps. Claim Narrative 11, 13.

After Cooper Carry substantially completed its design services for the hotel in

April 2014, Compl. ¶ 15, Hensel Phelps initiated a private claims process in January

2015, as required by an exhaustion clause in the contract with Cooper Carry. Compl.

¶ 16. In support of that claims process, Hensel Phelps filed an extremely detailed report

of the problems that arose throughout the course of the working relationship with Cooper

Carry (the "Claim Narrative"). The Claim Narrative includes a chronology of events that

the parties agree is factually accurate for the purposes of this motion. *See* Def.'s

Statement of Material Facts As To Which There Is No Genuine Dispute [hereinafter

"Def.'s Material Facts"] [Dkt. #10-13]. In November 2015, Hensel Phelps brought this

lawsuit against Cooper Carry, asserting two theories of liability: that Cooper Carry

breached its design services obligations by making errors in its designs and that it

breached its obligation to indemnify Hensel Phelps for those errors.

## ANALYSIS

### I.     The Court Applies the Summary Judgment Standard to Decide This Matter.

Because Cooper Carry referenced materials outside the four corners of the

Complaint to support its Motion to Dismiss arguments, the Court will analyze those

arguments by applying the summary judgment standard. *See* Fed. R. Civ. P. 12(d).

Hensel Phelps argues that, as a general matter, summary judgment motions are disfavored

prior to the close of discovery, *see* Fed. R. Civ. P. 56(b), but it fails to articulate any

issues of fact for which it would need discovery. Accordingly, Hensel Phelps has not put

into dispute whether it had "a reasonable opportunity to present all the material that is

pertinent to the motion," as is the requirement under Federal Rule of Civil Procedure

12(d) for converting a motion based on the pleadings to a motion for summary judgment.

The only document on which Cooper Carry relies is a summary of the facts

authored by Hensel Phelps itself. *See generally* Claim Narrative [Dkt. #10-2].  When

Cooper Carry submitted it as the basis for its motion for summary judgment, Hensel

Phelps did not file any response challenging it as an inaccurate reflection of its

understanding of the material facts.  *See* Def.'s Material Facts.  Hensel Phelps has

therefore conceded that the Claim Narrative presents the undisputed material facts for

purposes of deciding summary judgment.  Considering those facts and making all

reasonable inferences in favor of Hensel Phelps, its claims are legally foreclosed for the

reasons explained below.

## II.     The Statute of Limitations Has Run on Hensel Phelps's Claim That Cooper Carry Breached Its Design Obligations.

The parties agree that District of Columbia law applies and that there is a three-

year statute of limitations on Hensel Phelps's breach of contract claims.  *See* Def.'s Mem.

8; Pl.'s Opp'n 4 (citing D.C. Code Ann. § 12-301(7) (2009)).  The question the Court

must answer, therefore, is when that three years began to run for the claim that Cooper

Carry's designs breached its obligations under the design services contract—when

Cooper Carry delivered those design documents that Hensel Phelps relied upon, as

Cooper Carry argues, or when Cooper Carry's design services for the hotel project were

"substantially complete," as Hensel Phelps argues.  If the former, then the claim is time-barred; if the latter, then it is not.

"Actions usually accrue when they come into existence." *Felter v. Kempthorne*, 473 F.3d 1255, 1259 (D.C. Cir. 2007) (citing *United States v. Lindsay*, 346 U.S. 568, 569 (1954)).  Accordingly, a breach of contract action usually accrues at the time when a party to the contract does not perform its duty under the contract.  Indeed, District of Columbia law is clear: "accrual for contract cases occurs when the contract is first breached." *Capitol Place I Assocs. L.P. v. George Hyman Constr. Co.*, 673 A.2d 194, 198-99 (D.C. 1996) (abrogated on other grounds).  Once the breach is committed, the statute of limitations begins to run even if the breaching party still has additional contract duties to perform, even if the full scope the consequences from the breach are not yet apparent, and even if there is still an opportunity to remedy the consequences of the breach to minimize or eliminate damages.  *See Wright v. Howard Univ.*, 60 A.3d 749, 752-54 (D.C. 2013) (a university's first breach of an employment contract, by not performing an employee's performance review, started the clock running even though it had additional contract duties to perform and even though it had not yet denied the employee tenure, which was the injury at issue).  However, courts do sometimes toll the statute of limitations if there is a lag between the moment of breach and the time when the plaintiff discovers the breach.  *See Ehrenhaft v. Malcom Price, Inc.*, 483 A.2d 1192, 1203 (D.C. 1984).  But the exception for undiscovered breaches, as with many

exceptions, tends to prove the general rule: once the plaintiff *can* bring a breach of contract claim, the clock starts running against it.

In this case, there can be no dispute that Hensel Phelps *could* have brought a claim for breach of contract when it recognized that it would need to change construction plans to accommodate for the errors in Cooper Carry's design documents. The costs Hensel Phelps claims as damages in this suit arose from those particular changes. Hensel Phelps must admit, therefore, that it had accepted Cooper Carry's non-conforming designs at the time it began to construct the hotel in accordance with those designs. *See, e.g.*, Claim Narrative 9-11 (describing the fallout from Cooper Carry's February 27, 2009 GMP drawings that were incorporated into Hensel Phelps's construction contract as well as from Cooper Carry's "60% Construction Documents" issued March 16, 2011). Even if Cooper Carry still had *other* duties to perform that were not yet due under the contract, Hensel Phelps cannot credibly argue that Cooper Carry still had time to perform its contract duties with respect to the initial phase of design that preceded Hensel Phelps's construction. Once the time for compliant performance had passed and Hensel Phelps had accepted the initial design documents on which its claim for damages is based, the clock began to run against Hensel Phelps.

Hensel Phelps tries to avoid this result by arguing that a "unitary construction contract" is governed not by the first-breach rule, but by a more lenient requirement under which the statute of limitations does not begin to run until the construction project is "substantially complete." Pl.'s Opp'n 5 (citing *Constr. Interior Sys., Inc. v. Donohoe*

8

*Companies, Inc.*, 813 F. Supp. 29 (D.D.C. 1992)). Hensel Phelps contends that Cooper

Carry's outstanding duties under the design services contract prove that it had a unitary

construction contract that was not substantially complete when Hensel Phelps began

relying on the designs. *Id.* at 8-10. I disagree. Hensel Phelps is pointing out a distinction

without a difference. How so?

Hensel Phelps cites several cases in which the statute of limitations did not begin

to run until a construction project was "substantially complete." But those cases follow

the general rule explained above, even if they do not use the phrase "first breach," which

was only articulated later in *Capitol Place*. In those cases, the breach that triggered the

clock occurred at the time for delivery of the construction project. *See Constr. Interior*

*Sys.*, 813 F. Supp. at 33-34 (contract to refurbish hotel rooms is not breached until all

rooms finished); *Pioneer Roofing Co. v. Mardian Constr. Co.*, 733 P.2d 652, 660 (Ariz.

Ct. App. 1986) (contract to install a roofing application is not breached until roofing

application complete, regardless when construction defects were corrected); *President &*

*Directors of Georgetown Coll. v. Madden*, 505 F. Supp. 557, 567 (D. Md. 1980), *aff'd in*

*part, appeal dismissed in part*, 660 F.2d 91 (4th Cir. 1981) ("The breach of the

construction contract therefore occurred only upon final acceptance of the building under

the contract."). Because the sole obligation of a unitary construction contract is to deliver

the entire construction project in conformity with the contract, "first breach" does not

occur until the project is substantially complete. Said another way, a contract for a

unitary construction project cannot be breached part way through the construction

process, even where there are errors that will undoubtedly result in non-conformity, because the time for delivery and acceptance has not yet arrived.

Unfortunately for Hensel Phelps, this is *not* a unitary construction contract case. Here, Cooper Carry had delivered and Hensel Phelps had accepted the designs about which Hensel Phelps complains; indeed it had begun to act on them. By Hensel Phelps's own allegations, it was this acceptance of these non-conforming designs that caused damages to begin racking up long before substantial completion of the hotel project as a whole. Accordingly, it was when Cooper Carry delivered those designs, not when it substantially completed all its design duties, that the clock began to run. Accordingly, Hensel Phelps is time-barred from bringing its claim that Cooper Carry breached its design obligations.

## III.   The Parties' Contract Cannot Be Fairly Read to Create the Indemnification Claim that Hensel Phelps Pleads.

Undaunted, Hensel Phelps pleads an alternate theory of liability: that the indemnification clause of Cooper Carry's design services contract makes it liable for costs that Hensel Phelps incurred in rectifying Cooper Carry's design errors. But that, of course, is not the natural way to read an indemnification clause. Indeed, indemnification clauses are generally interpreted narrowly against the party seeking indemnification. *American Bldg. Maintenance Co. v. L'Enfant Plaza Properties*, 655 A.2d 858, 861-62 (D.C. 1995). As such, Hensel Phelps's indemnification argument, for the following reasons, is of no avail here.

Under the indemnification clause in the design services contract, Cooper Carry is required to "indemnify, defend and hold . . . harmless" Hensel Phelps "from and against any claim judgment, lawsuit, damage, liability, and costs and expenses, including reasonable attorneys' fees, as a result of, in connection with, or as a consequence of [Cooper Carry's] performance of the Services under this Agreement . . . ." Compl. Ex. 1, § 6.01. Cooper Carry, naturally, argues that this clause refers only to liabilities that Hensel Phelps would face from third parties, not to Hensel Phelps's own "damage" and "costs and expenses" from contract breaches. Def.'s Mem. 18-22. I agree.

The words "damage" and "costs and expenses" in the indemnification clause are listed along with other words that clearly anticipate the problem of third-party litigation against Hensel Phelps for problems that Cooper Carry created. Moreover, if the Court were to read the indemnification clause in the way Hensel Phelps urges—to cover Hensel Phelps's own liabilities for the costs it incurred in fixing Cooper Carry's mistakes—then it would be redundant. The principle obligation of the contract requires Cooper Carry, if it breaches by making design errors, to cover Hensel Phelps's damages, including Hensel Phelps's "liabilities" to third parties. It is unlikely the parties intended the indemnification clause to create an additional opportunity for breach, arising from the same design errors, on the imagined possibility that Hensel Phelps could face litigation from third parties if it did not pay its own obligations. That litigation would involve an intervening decision by Hensel Phelps to breach its own agreements, a decision for which Cooper Carry would not be at fault. Rather, reading the indemnification clause in the

11

most obvious way, it requires Cooper Carry to cover Hensel Phelps's liabilities when and if a third party sues over problems caused by Cooper Carry's fault. *See Landmark Health Solutions, LLC v. Not for Profit Hosp. Corp.*, 950 F. Supp. 2d 130, 139 (D.D.C. 2013).

Because Hensel Phelps's claim for indemnification cannot survive the narrow construction that the Court must give the indemnification clause, judgment for Cooper Carry on that claim must be GRANTED as well.

## CONCLUSION

For the foregoing reasons, plaintiff Hensel Phelps cannot prevail on either of its two claims against defendant Cooper Carry. Accordingly, Cooper Carry's Motion for Summary Judgment is GRANTED. An order consistent with this decision accompanies this Memorandum Opinion.

RICHARD J. LEON
United States District Judge

12